I'm going to ask everybody to please keep their voices up. For the record, my name is Jeff Landon, I represent Marie Joseph, and I ask to reserve six minutes for rebuttal. The phrase, with great power comes great responsibility, is well known in popular culture at this point. In the current generation, it's frequently attributed to the Spider-Man franchise, where one of the characters says that. More classically, it's attributed to Lord Melbourne in the early 19th century, who basically said the same thing, with great power comes great responsibility. In this case, Ron Joseph had that power, along with his sons, and he exercised that power without responsibility, without adhering to the requirements of Crosby v. Beam, the guiding principle of minority shareholder oppression law in the state of Ohio. The direct right of action that Marie has, as a matter of right under Ohio law, is drawn from that case. One of the key questions is, did Marie Joseph, as a minority shareholder, have rights to disclosure? To know that the majority and controlling shareholders were not operating the business to her detriment, and not running the company for their own benefit. This is a good assessment of what the case is about, but you have six or seven specific issues you want us to look at. Is there a specific issue you want us to focus on first? I will jump straight into it. I understand your sense of what the case is about. We know that. Let me first address the issue of who was the majority and controlling shareholder. The district court made that determination, exercising the court's determination, making its factual determination, that Ron was the one who was the only one who would be responsible in a direct action pursuant to Crosby v. Beam. That allowed Ron's sons to get out of the case on a motion for summary judgment. That was a factual determination. Here, the actual evidence in the record demonstrates that Ron, along with his sons, took control of the company in a move that happened over a couple of days back in 2013, in which the court provided, along with Ron, the supermajority that they needed to adopt a code of regulations that had two major effects. One, it took Marie Joseph and the other sisters in the family who were, prior to that, on the board, and eliminated their board positions, effectively consolidating power in Ron himself and eliminating the ability of Marie and others to exercise any rights as board members, under which they previously, at least theoretically, had, but which Ron had not, frankly, allowed them to use because of their nondisclosure that came from Ron and or from the sons. How was your client injured? I mean, you're saying before this happened, before the bylaws were amended, she never participated, she didn't participate? Ron never called a board meeting. Ron never had shareholders. So why does it matter? That was before or after, so why does the amendment matter? It matters. She wasn't consulted in either case. It matters because at the point in time when they took control by putting in a new code of regulations, it is the action of Ron and Ron's sons that takes the supermajority that now puts Ron in as the sole director. So how did that injure Marie? That injures Marie because from that point on, she has no rights as a director, but it also injures her because it allows them to close the circle and just do the transactions between and among themselves that form a major part of the case. As the court is aware, there were a series of self-dealing transactions that occurred and in those self-dealing transactions, the people on both sides of the transaction are the same people. It's Ron and his sons acting through Columbia, Ron as the titular head of the company as and according to their own testimony at trial with Pond Realty Company, also known as Joseph Management, functioning as the one operating things on a day-to-day basis. So they control that into the transaction and then, this is how Marie gets rid of it. Did all of that happen after this change in leadership? I'm sorry, did you hear clearly? Did all of that happen after the board change, the Pond Realty and a few, what year was this? This is 2013. 14 or 13? 2013. Okay. The short answer to that, Your Honor, is we don't know fully because we weren't permitted to do discovery back far enough to find out. That's another one of the things that harmed Marie at the trial court level is that she wasn't allowed to do discovery back before a fixed date. That's not an issue before us, is it? I believe that it is because the discovery itself was excluding from the case information that was pertinent throughout the entire period. I mean, Marie asserted fraud in her claims. What is the, okay, the claim relating to that shareholder vote was what? Well, it all ties into a series of related claims based on minority shareholder oppression and failures by Ron and his sons to comply with their fiduciary duties of disclosure, not to engage in self-dealing, and tied into that, whether the transactions by their nature were fraudulent in that, as Marie has asserted, and again, back to the issue that Judge Riedler, that you'd raised, how far back does this go? The court at the district court level cut it off, but based on the discovery rule and based on Marie's allegations of fraud, she should have been able to reach back as far as she could see. Well, it kind of cut it off because one problem is there's just a lot of issues in this case and I feel like we're weaving together a lot of issues, but does this go to the point about the deposition in 2009 where Ron disclosed what he thought he owned and what he thought the corporation owned, and the court said that your client waited too long then to bring at least some of her claims regarding fiduciary duty because she was on knowledge of the reported breach? Indeed. That is where part of that ties into, and that the court predicated that on the idea that it had been disclosed to her, but you have to look closely. What was disclosed? First of all, if you look at the deposition itself, it's muddy at best. It's talking about some undisclosed, undescribed, unspecified companies, but that's about who owns what, and the bulk of the transactions that Marie has raised as fraudulent are individual transactions between and among those companies, and there is nothing in that deposition to suggest that there were self-dealing transactions occurring. What the argument that prevailed in limiting the temporal scope of the case came down to the idea that if Ron had said that he did something that could later be characterized as bad, then Marie was supposedly on notice that he'd been doing all the self-dealing. Well, that's not the case. The self-dealing? I thought some of the self-dealing went to trial. Some of the self-dealing went to trial, yes. So the things that occurred later on did go to trial, the formation of corporations that Marie says she should have interest in, that was cut off by the deposition. Just trying to sort out your arguments. Well, and again, part of it is, part of the problem is, and I recognize we're very short on time here, but the court chopped the case up in terms of limiting the time, eliminating the fraud claims, even though, and again, it's key, and I went very short on time. By chopping up, another way to say that is it enforced the statute of limitations. Well, but the actual fraud claims were thrown out on the basis that the claims had not been identified with sufficient specificity. The court first ruled that they had been, and then later 180'd and said that they had not been. I recognize I'm out of time, happy to answer any further. What is the statute? Is it four years? It would generally be four years, yes. Okay. And to the extent that Ron had not disclosed any of these activities prior to that time, Marie's position is that all of that's in play because it had not been disclosed, and the nature of the transactions themselves was fraudulent. Did she know she was removed as a director? She knew that she had been removed as a director. She, and again, I will note for the record, that is the position taken by Ron, and they certainly treated her that way. The very meeting in which that occurred is disputed as to what had happened. But again, Judge, the district court itself made factual determinations that treated various things as having happened based merely on the assertions that they had happened and without allowing the proof to go forward at trial. Can I ask you about the jury instructions? You haven't really mentioned those this morning. Right. So you have a problem with the knowledge instruction, you have a problem with the agency instruction? We have a problem with both, yes. The reason being that, first of all, the burden was on Ron to come forward with proof justifying the fairness of the various transactions. What actually ends up happening is that instead of Ron and his sons, as both the titular and They get the sons, get out of the case on summary judgment on the idea that they weren't necessary to control, a factual determination in and of itself. And then, with that having already occurred, at trial, Ron suddenly becomes, and we use the phrase in the district court below, becomes a Sergeant Schultz defense, an Enron defense. I don't know what the people under me are doing. I know nothing. I'm not responsible for this. And the court then, instead of imputing the knowledge and conduct of those who worked for Ron to Ron, went the exact opposite way. And basically said, if Ron didn't know about a particular transaction, he could not be held responsible for that transaction, allowing him to stay up high and say, I'm above all of this. In the corporate setting, I've been trying to figure this out because it's sort of a knowledge of the employees is imputed to the corporation, but it's not necessarily imputed to the president or an officer of the company. Understood. In the context, however, of a closely held corporation, if we'd been told ahead of time there was going to be a requirement that we demonstrate Ron's knowledge of individual transactions, several things would have been different. One is, we would have known that, even though that's not a requirement of Ohio law. What do you mean? It was in the instructions. So you're saying you didn't know it during discovery? We didn't know that that was going to be the case during discovery. We didn't know that. Well, you don't know a lot of things during discovery. You've got to take discovery on all the possible issues and then it sorts itself out as the case moves ahead legally. Exactly. And we'll be talking about that more in the second appeal. But part of what we were trying to figure out is, we see the equivalent of a check register, like a normal individual's check register. Check to this person going out on this date. You can see the transaction happen, but you can't tell what's behind it. I don't know. We weren't permitted to explore that. I guess, I mean, you want an agency instruction, but agency didn't seem quite like the right principle to apply here. As to Ron, again, I understand that the employees of the company are, sometimes their knowledge is imputed to the corporation, but why would it be imputed to Ron specifically? Why should we impute? I understand Ron has this defense that he didn't know. One response would be that these were all the employees of the company, so by law, we're going to impute that he knows. But I don't know that that's the right legal rule. I know it's your position, I think you want us to adopt, but I'm not sure that's the right legal framing. Well, I will respond, Your Honor, as follows. If that is not the case, then all the majority controlling shareholder needs to do is get good people who know where their bread is being buttered, and allow them to do the transactions on an individual basis for the person who unequivocally is the majority shareholder, and in this context, at least one of the controlling shareholders. They go do what is required, and then the information about that is not provided directly to the president, or in this case, again, not because he's president, but because he's the majority and controlling shareholder, and he can escape responsibility. I didn't think about it. I wasn't there. I guess in the knowledge, you know, for the knowledge instruction, maybe you could have asked for new or should have known. So you can't totally bury your head in the sand if obvious misdeeds are happening under your watch, but you didn't, I don't think you asked for that, specifically in the knowledge instruction. I know you don't like the knowledge instruction, but you could have asked for a caveat there. Well, our jury instructions would have required, and this is, we were approaching it in a slightly different way. We wanted jury instructions that included a recitation to the jury of the various duties that Ron had, including the duty to prevent, avoid self-dealing, not to engage in self-dealing. And in the context presented, he not only knows what's happening, or should know, as you're phrasing, what's happening in his capacity as the head of Columbia, but keep in mind that many of these transactions, the person or entity on the other end is either Pond Realty or one of these other auto dealerships that he later claims he owns separately. So there are two ways that he has knowledge of it. The idea that he can simply accept the money, accept the benefit of it, unequivocally be the top dog at the company, and then say, I don't know anything about it, in a small company. But what about the jury? I'm sorry. I assume you argued all that to the jury. We were limited in what we could argue to the jury, in major part because we were prohibited, this is again one of the errors made at the district court level, we were prohibited from portraying the entirety of what had occurred, in that the Joseph Auto Group, the so-called It's expansion. It's a different issue. So in response to Judge White, you did argue some of these things to the jury. We did. We did. The parking lot and the country club membership and those things, and you lost. And then you're saying there are other things you wanted to argue. But in response to Judge White's questions, a lot of these points you're making, you did get to argue to the jury. But what had made it through to that point were the, frankly, in a way, I use the term sawdust of the case, in that those were individual specific things that had made it through. The overall picture of Ron and his sons taking the assets of Columbia, making no dividends, and instead making sure that the money and value went to the other companies in the Joseph Auto Group. The asset of Columbia meaning what? Excuse me? I'm sorry. The asset of Columbia, what are you referring to? The assets. Assets. Assets. Okay. Of Columbia being the value in each year, a significant amount being taken at the end of every year and being sent to Pond Realty Company. But all of that was litigated, wasn't it? We were permitted to provide only limited information about that because... Only what? Only limited information about that because the overall context of the so-called Joseph Auto Group and how it was being managed, we've been told, you can't talk about fraud, you can't talk about the Joseph Auto Group. So we're having to put forward these transactions and what happened with that money and that value in a vacuum. So we're hamstrung in terms of our ability to properly present the case by all of the summary judgment rulings and motions in limine that had happened on the way in. Okay. Were you not permitted to tell the jury that this started as a family business? I believe the jury was permitted. We were permitted to and I believe we did inform them. I'm sorry. I'm not hearing you. Say it again. We had the ability to tell them that and we did in fact tell them that the Columbia Oldsmobile Company had started as a family business. And that was... But we were not able to then explain that the family business was then morphed, changed over time by Ron and his sons. Okay. Were you able to discuss... Some of these dealerships were acquired within the limitations period, right? Yes. Okay. Are you saying you were not permitted to... Why weren't they part of the trial? Because the district court had made the determination that we would not be permitted to put on a case about, quote, the Joseph Auto Group. Our position being, as previously stated, that that is simply a manifestation of Columbia's being broken off and distributed to the Ron and his sons. And instead, we were strictly limited to talking about Columbia itself and the dealerships that were acknowledged by Ron to be part of that business, plus the Pond Realty Company, which we were allowed to talk about, in which Ron was the president and his sons were the owners. And that's where the... calculate a management fee, send that money to themselves, and then, for decades, issue no dividends. Why not? The money had gone into the... All right. You'll have your full rebuttal. Okay. Thank you. Thank you. Good morning. May it please the court. I'm Scott Kane with Squire Patent Boggs. I'm here for defendants Gregory Joseph, George Joseph, Richard Joseph, and Ronald Joseph. I'm here for Ronald Joseph, Jr., not for Ronald Joseph, Sr., who's represented by other counsel who we're splitting time with this morning. My clients were often referred to below as additional defendants in the pleadings. I'm going to refer to them the same way. I'm sorry for speaking quickly, but we have a lot of ground to cover, given the number of issues that were raised. But I want to dive right into some of those issues now, Your Honor, and address some of the questions that the panel has asked. As one sort of baseline, fundamental issue to understand, my clients are nominal shareholders of Columbia. They each own less than 1% of the voting shares of Columbia, and they acquired those less than 1% of shares by gift when they were minor children. They didn't even control it. So that is undisputed. It has never been disputed in the case. After two and a half years of litigation, I think 22 depositions, several hundred thousand pages of production, the claims against my clients really boiled down to one thing the court heard about already. In May of 2013, there was the shareholder meeting, and my clients signed a consent. And then the next day, there was a shareholder meeting that reduced the number of directors in Columbia to one director. So it is the case under the articles or the bylaws that Ron Sr. needed two-thirds, and so he needed some percentage of vote from the sons? That's true? Not exactly, Your Honor. If they could have done it in an alternative way, where Ron Sr. could have done it on his own at a meeting. I'm sorry. That's good. Go ahead. To do it by written consent rather than shareholder vote, you needed two-thirds. Right. That is accurate. Well, I mean, there was obvious benefit, right? He didn't have to deal with his siblings. No, Your Honor, and here's why, and I wanted to address this. You asked, what changed after that? And the answer to that is absolutely nothing. You heard Mr. Landon say that there weren't even director's meetings before that. If you look at the record, plaintiff has consistently been clear that they're not suing Ron Sr. in his capacity as director. They're suing him in his capacity as controlling shareholder. He was already the majority shareholder of Columbia before that action. What else changed? Nothing. If you look at plaintiff's claims, these alleged corporate opportunities for acquisition of dealerships, those occurred years earlier, in some cases decades earlier. Weren't there some acquired within the statutory period? There was at least one, a Volkswagen dealership that was the subject of summary judgment, finding that it was not a corporate opportunity based on the way it arose, based on the undisputed facts. But the other dealerships, no, Your Honor. Some of these dealerships, the very first dealership that was opened after Columbia was a dealership called Joseph Chevrolet, opened in 1965, opened outside of Columbia. So what did arise afterwards were some of these self-dealing, the parking lot and the payments for memberships at different places that the company was authorizing. Maybe some of those, Your Honor, and I can't cite chapter and verse on the date of every one of those, but all of those that were in the limitations period, as Your Honor was just referring to, was what was tried to a jury and what the jury rejected. We keep hearing the centerpiece of this case is about these management fees. The management fees were in existence long before this 2013 shareholder vote. Those were tried to the jury, by the way. If you look at the eight-day jury testimony transcript, there was no issue that was a greater subject than the management fees. Multiple witnesses, both defendants, third parties, existing employees, former employees testified about the management fees, and nothing about those management fees changed after 2013. Mr. Van Emen, the former CFO who was instrumental in setting up the management fees, he testified at trial when asked how old were the additional defendants, my clients, when the management fee program was established. His answer was, probably old enough to shave. And is that the agitation that resulted in jury interrogatory number six, on the breach of fiduciary duties based on management fees? It is, Your Honor. The interrogatory answer there was whether Mr. Joseph caused the management fees. The jury answer was no. And the basis of that was the testimony from all the former CFOs that they set up these industry standard beneficial management fees program decades ago, and that it benefited Columbia. Did your clients have any issue at trial? Was the trial just as to liability for Ron Senior? It was only against Ron Senior, Your Honor. My clients have been granted summary judgment fully. I do want to address a standing issue if I can, and I don't want to take up my co-counsel's time. It is undisputed that my clients are not majority shareholders of Columbia. The district court correctly held that there was no basis for a direct claim against them under Crosby. This is covered extensively in the briefing and in the underlying summary judgment motions. The best exemplification of that legal principle is a case called Palmer v. Fox Software, and I'm saying it's a great case not just because Judge Boggs was on the panel, but in that case there was a claim by one minority shareholder of a closed corporation against another minority shareholder. If you read the description of the claim, it's one minority shareholder saying the other acted to benefit the other minority shareholder's other interests and took opportunities of the corporation and benefited financially. And what this court held in that case correctly based on Crosby v. Beam is there is no basis for a direct claim there. Crosby v. Beam does not allow it. There is no basis for a direct versus derivative claim by one minority shareholder against another. This court has likewise held that. In another case, Ashenburg v. I think it's Columbus Showcase, and in that case plaintiffs advocated for the ability of one minority shareholder to sue another under Crosby, and the court held correctly that there is no such claim. The court said that reading of Crosby was, quote, far too broad, and that what Crosby actually held, and it does hold this if you look at the syllabus, is that control of the corporation by owning majority shares is what matters, and that the fiduciary duty associated with a majority shareholder, quote, obtains in a closed corporation and is heightened. The Ohio Supreme Court has never held in Crosby or otherwise that there's a basis for a claim by one minority shareholder against another outside of the derivative context. This court has repeatedly held otherwise. I want to wrap up to allow my co-counsel his time. On the statute of limitations issue, it's important to emphasize there is no allegation of any misrepresentation by my clients. The plaintiff was asked that in her deposition, could not identify any. She was asked that in written discovery, could not identify any. She repeatedly turns to alleged nondisclosure and purported concealment. This court in Bell v. Bell, it's an unpublished opinion but an excellent discussion of the underlying Ohio law, very specifically says alleged concealment is not enough to toll the statute of limitations for breach of fiduciary duty or to apply the discovery rule and cites the Squire v. Guardian trust case and the numerous other cases standing for that proposition that we cited below, which have never once been disputed by plaintiff. They just returned time and again to superficial accusations of concealment, which even if true are insufficient to apply the discovery rule. I think my co-counsel will talk about even if the discovery rule applies, it was triggered in 2009. Thank you. I'd like to dive right into some follow-up questions on the jury instructions, specifically in response to your questions for the Greenberg. And I saw Judge Boxley looking at the verdict form, which I think is a good place to orient ourselves. I think some clarification as to the two assignments of error with the instructions, the non-instruction and the agency instruction would be helpful. So stepping back just a bit, the claims that Marie tried to deter were based on alleged breaches of bronze fiduciary duty and consisted of two components. The first was alleged usurpation of corporate opportunity, and the second was business transactions that she challenged as undisclosed self-duty. I didn't hear the end of what you said. The second category are business transactions she challenged as undisclosed self-duty. Okay. So the first category of a breach of fiduciary duty, like usurpation of corporate opportunity, that is dealt with in interrogatories number one and two and a separate set of instructions. That is not an issue on this appeal at all. So when we're talking about the knowledge instruction and the agency instruction, we're talking about interrogatories number three through seven, which were Marie's challenge to five categories of transactions that she alleged were undisclosed self-duty. So starting with the knowledge instruction, first of all, there was no error because that was a correct statement of Ohio. The district court directly relied upon the Sachs case, the FinSAC case, and another Ohio case, Blond versus Bank One, which holds that a fiduciary under Ohio law is not liable for disclosing information or failing to disclose information that he or she does not know about. So it was a correct statement of Ohio law, and Marie has cited no case of Ohio law to the contrary. But secondly, there's no harm. It's clear from the verdict form that no aspect of the jury's verdict on these five categories of self-doing transactions turned in any way on Ron's lack of knowledge. Three of the five transactions, the jury held that Ron caused them, but he did not have a material pecuniary interest in them, or that they were entirely fair to Columbia. And the other two, the jury found that Ron did not cause them. So in no way did any aspect of the verdict... Why did Ron not cause them? So Ron did not cause them... Which two were those? Yeah, two of them. Which two were they? Jury in Haragi Court No. 6, the management fees. Okay. And Ron did not cause them because of undisputed testimony at trial. Was that Columbia's CFO, in consultation with his outside accounting firm, set up those management fees based on industry standards, and every year the CFO, in his capacity as an officer and employee of Columbia, independent with no direction or involvement by Ron whatsoever? Did Ron know about them? The management fees? Yeah. I believe the testimony at trial was that he didn't know about them. He knew that they were happening, but he did not implement or direct them. So all this fight about the knowledge... It sort of struck me that maybe there should be some instruction that Ron knew or should have known, right? I mean, there's this idea of burying your head in the sand and completely ignoring obvious facts, and maybe they tried to get that in through an agency instruction, which to me doesn't seem like it totally fits. But your point is that on this lack of... They want to call this Sergeant Schultz for a sordid cultural reference, but that only goes to the parking lot and a couple of other business opportunities that were theoretically lost from Columbia? That's correct. There is a knowledge question on the two USERP-based... USERP-alleged USERP parking lots. That is not an issue on appeal, and the parties agreed that that was an element for that fight. I believe it's the jury instructions, internal page 25, are the elements for USERP-ation, the first one being knowledge. No dispute, Marie, there's no objection. The parties agree on that. But if you look at the self-healing transactions, interrogatories three through seven, the question that goes to knowledge is really question number three. And Marie agreed with each of the components of the interrogatory, so there's no objections to that. So question number three is whether Marie proved that Ron failed to disclose this category of transactions. So that is the only question that went to Ron's knowledge, and on none of the five categories did the jury need to reach a verdict on the basis of that question. On four of them, they never got to that question. And on the fifth one, they found that Ron caused it. They had an interest that he failed to disclose it, but that they were... For the agency instruction that they were requesting, did that go to just the first two interrogatories or to all of them? Good question. It went to two interrogatories, which are interrogatory number five and six. Number five dealt with three loans at Columbia CFO. The testimony was independently made so that Columbia could earn interest. Those loans were fully repaid with interest. And then the second category was the management fees. So again, a district court sitting in its discretion, having heard all of the evidence, as you pointed out, Judge Raebler, that there's no principle by which these two sets of transactions, whose testimony was independently implemented by officers and employees of Columbia, could somehow be imputed back to the majority shareholder. Such a holding would make the majority shareholder potentially liable for any and all actions of independent officers and employees of Columbia. So those are the jury instructions. As a matter of any time, I'd like to just quickly hit two other issues, the Joseph-Otto group theory and the summary judgment decision. So the Joseph-Otto group theory, the district court correctly exercised its discretion in excluding evidence and argument on that for a number of reasons. The first being of which that is not a claim in the case. Again, the claim in the case is that Ron breached his fiduciary duty in two ways, usurping corporate opportunities. So why would it pertain to usurping corporate opportunities? I mean, you have sort of this family business that deals in selling automobiles and has some land activities, and then opportunities come along, and the managing director or CEO doesn't use the business, the existing business or its capital, but takes advantage of the opportunities himself, and in some cases by borrowing money from the original company. So instead of having the original company buying it with their own money, he borrows the money from the company and then buys it in his own name. So why is that, why is the original company not relevant to this? So that claim you just described was a claim. That is a legal claim in the case. It's called usurpation of corporate opportunities. There are specific legal elements for that claim, and so through two rounds of summary judgment rebate, the district court narrowed that claim to two parting points, and that's what proceeded the trial. The district court's rulings on those other alleged usurpation of corporate opportunities is not an issue before this court. The Joseph-Otto group theory was not a legal claim. That was Marie saying, I want to argue to the jury that they can declare this entity that doesn't exist as a matter of law, in fact exists, and owns all these other companies. And the district court correctly held that's not a legal claim. Your legal claim is usurpation of corporate opportunities. That's proceeding the trial on the two parking lots, and the other summary judgment rulings have not been appealed. This Joseph-Otto group theory is not a theory, and in fact it would be misleading and confusing because it contradicts the claims that you're presenting to the jury. Your claim to the jury is that Ron took dealerships outside of Columbia and then engaged in transactions with them outside of Columbia. This theory would contradictorily argue that Columbia owns everything, so there's no usurpation, there's no self-dealing, so the court correctly exercises discretion in excluding that evidence. I see that my time is up. If I could just briefly touch on the summary judgments that you mentioned this year. So the important point to keep in mind here in terms of Ron is that although Marie attempts to argue that there were two types of fraud claims and the districts were only ruled by one, that is simply not true. The only Rule 56 evidence of any alleged fraud or concealment by Ron were five statements, which Marie identified, and this morning her argument reads something else. Five alleged statements by Ron between 1985 and 2007 to the effect that Columbia owns everything, Columbia owns all dealerships, and these assets Columbia owns it all, which the allegation is concealed from her or misrepresented to her that independent dealerships were set up, which is her usurpation claim, or that self-dealing transactions occurred, which is her self-dealing transactions. So the question before the district court, given that that was the only evidence, Rule 56 evidence, of alleged fraud, which as the Supreme Court has said in the Anderson v. Quimby law, if you can sell a tax case, you cannot rely on the pleading to confer that evidence, that was the only evidence. So the question before the district court was simply, was Marie on notice of the mere possibility, because that's a standard under Ohio law, there's no dispute about that, the mere possibility more than four years prior to filing her lawsuit that Columbia didn't own everything. And the answer to that is unequivocally yes, because in 2009 Marie sat in a deposition, in Rob's deposition, when he testified under oath that Columbia owns only the Acura Hyundai dealership and some real estate downtown, that the other dealerships are independent, and probably most importantly, and follow up to her counsel's question, that none of the other siblings, including Marie, own a piece of those other dealerships. And that's it. I'll point you to the two pages of testimony. It's record 46-3, page ID 1099, and record 46-3, page ID 1154. There is no question based on that sworn deposition testimony that Marie heard in 2009, she should have at least been aware of the possibility that Columbia didn't own everything. Which began the running of the four-year statute of limitations in 2009, which then expired in 2013, more than three years before she filed suit. So in conclusion, I would say Marie's other miscellaneous arguments that we haven't addressed here today, there's no basis for reversing the district court rulings on those arguments, either for the unanimous jury verdict below, I direct the courts who are briefing on those issues. And so to wrap up, I would just ask that the court affirm that the district court ruling and the unanimous jury verdict are on paper after a full and fair presentation. And the reason the agency instruction was inappropriate was why? Two reasons, Your Honor. First, there's no principle of law by which the court could impute knowledge of actions or knowledge for the acts of independent officers and employees taken in their capacity as such to the majority shareholder of a corporation. There's no law that supports that. Acts and knowledge of agents might be imputed to the principal, which would be Columbia, but not to the company's majority shareholder. And the second reason is that Marie does not carry the burden of demonstrating any harm, how that would have impacted the jury verdict in any way. She cannot point to a single piece of evidence, 17 witnesses, dozens of exhibits, her own experts who testified that he could not offer any opinion that the transactions were unfair or that Marie was harmed in any way. Marie has not cited any piece of evidence to suggest that if that instruction was offered, the jury's verdict would have changed in any way, because it does not. Thank you. Thank you. Would you mind starting with that last issue, the instructional issue? Sure. From the instruction standpoint, the instruction that was actually given at the trial was, Ron did not engage in undisclosed self-dealing if he did not know about the transactions or transactions in which he is alleged to have an interest, as Ron did not have a duty to disclose transactions of which he was unaware. So the court not only failed to give an agency-type instruction or some other instruction that would recognize the practical control that he had over the company on the Columbia side, as well as on the company's receiving the money on the opposite side, and instead instructed the jury, well, if he didn't know about it, he did not have a duty. So your friend on the other side made the point that the agency instruction was only going to go to, I think, the management fees and a couple of other issues. I think Judge Boggs is on top of this, but it's interrogatories 5 or 6, not interrogatories 1 or 2. And with respect to the issues covered by interrogatories 5 and 6, that there was testimony that Ron knew about those arrangements, so that knowledge wasn't the problem for you. It was that these were blessed by auditors or accountants or other groups who were thought to be fair or reasonable. I'm not entirely sure, but the point being that knowledge wasn't the thing for which you wanted the knowledge instruction. Knowledge wasn't a question. We believe, as a practical matter, it was a question that was being presented and that Ron's entire theme at trial was... Well, I understand his theme, but just as to those specific claims... So which interrogatories did knowledge go to? I would say 5 and 6. It would apply to both. So you agree on that, 5 and 6? I agree. Okay. And at that point, the thing that was emphasized to the jury was the idea, and again, I want to point out one thing. It's a tremendously important practical consideration here. The jury instructions, the jury charging conference, happened after the proof was in. After what? After the proof was in. So we're being told after we've presented our case, oh, by the way, you have to now provide evidence to show that Ron knew. And in retrospect, you can look back on the proof that had been presented, and as we referred to at the Sgt. Schultz defense... I just thought on those claims, your friend on the other side, maybe I misheard him, said there was testimony as to 5 and 6. I thought that was the management fees and some other things, that Ron did know about that. There were some other things, maybe it was the parking lot, or some other things that Ron, maybe they were part of interrogatory 1 and 2, where Ron said he didn't know about them, but you didn't ask for an agency instruction or constructive knowledge on those claims. I don't know if that's right. That's what I understood your friend on the other side to say. At trial, the evidence that was being presented to the jury emphasized the idea that Ron had, in effect, delegated. And again, our position is the duty to disclose, the duty to not engage in self-dealing is not a delegable duty. It's his responsibility as one of the majority and controlling shareholders, and in fact the biggest shareholder, obviously, here. And what you had is witness after witness appearing and saying, I did not tell Ron about that. So I'm not sure what counsel is referring to in terms of acknowledging that he knew. The theme in much of the evidence presented was that he did not know about it. And that testimony that he didn't tell Ron and Ron didn't know pertained to interrogatories 5 and 6. It included those, yes. Well, what about 1 and 2? Frankly, at trial, we paid very little attention to 1 and 2. And they So your knowledge and agency was only to 5 and 6. It pertains to the, it applies as a practical matter to 5 and 6. We are not waiving our rights as to the other claims, but those were again Well, if you didn't argue it below, you sort of, if you've only argued in the case before this that it was only as to 5 and 6, then you have limited yourself. I will just note that the practical effect of the knowledge instruction related to the undisclosed self-dealing transactions where Ron is on one side of it and Ron is on the other side of it, and the CFO, I mean, the court just pointed out the idea that, well, there were, maybe these auditors or whoever looked at this stuff. It wasn't auditors. It was instead CFO on one side who's the same CFO of the receiving company. Yeah, I understand. And Ron appointed those people. So this idea that I've got somebody independent looking at this. Can I ask you one other legal question? This Crosby case, it's an interesting case. I don't view that as a piercing the corporate veil case. In other words, I think even under the construct of Crosby where you can sue the principal or managing shareholder directly, you don't have to bring a derivative suit, that it doesn't destroy the corporate form. The corporate form is still there, and so we still have to honor the distinctions between Ron as a shareholder and the corporation and obligations of employees to the corporation as opposed to a shareholder. Do you agree with all that? I agree that the form is still important, but the form, part of the theme of Crosby versus Veeam in applying it is that within the corporation, they are treated analogous to partners. So does the corporate form still exist? Absolutely, in a closed corporation vis-a-vis third parties. But in relation to each other, the individual shareholders, including the majority and controlling shareholder, have duties analogous to those of partners, which includes disclosure not to engage in self-dealing, et cetera. I was thinking about your argument that he didn't know and whether Crosby changes the analysis there. Because in the traditional corporate world, I don't think you impute everything that an employee knows to an officer or a shareholder as opposed to the corporation itself. Absolutely, Your Honor. But I will note that in this context, it's not everything. It's about transactions in which Ron is on both sides of the transaction. I would argue that even as a person. Oh, when you say Ron is on both sides, you mean that the corporation that Ron is a majority shareholder is? Ron is, exactly. Okay, that potentially is different. Ron is a participant in both, and in fact, Ron also receives. Okay, I understand that. Let me ask you about the phrasing of the interrogatories and how, if at all, this was argued. The jury is asked, for example, in number five, number six reads the same, did she prove that Joseph caused Columbia to disperse money or to cause them to have the management fees? It seems to me that one could make the argument that your head in the sand argument is causing, that is, if it's wink, wink, nod, nod, I have no knowledge of what you're going to do but you know what I want, that that would be causation. Did you? Were you allowed to argue it that way or did you argue it that way? Again, Your Honor, what happened there is this knowledge instruction that I read a few moments ago, we're made aware of that after we've already put on our proof. Okay, but I hear you're talking about the knowledge or the agency or both. It's really both in that they're complementary, in that in a corporation where there is someone in control, it is our position, that that individual cannot, as you said, wink, wink, nod, nod. Well, I understand that's the broad idea, but the language of especially the agency instruction by saying everything that they know you know, doesn't that make the majority shareholder responsible for everything they're doing, for their conduct, not just for their knowledge in your theory? In our view, the majority controlling shareholder who has put someone in the position to implement these transactions, they benefit that majority controlling shareholder. And we know that's not really disputed as a practical matter, that they convey benefit in some form. The question was whether there was sufficient fairness coming back the other way. The jury found, yes. But it goes to, there is benefit going to that other, to the majority controlling shareholder. And in that context, the fact that that is happening during his or her watch as the head of the company, is something that is, as I indicated, not delegable. And therefore, in our view, the rule should be, in applying Crosby versus Beam in this context, that the majority controlling shareholder has the duty to make sure there is no self-dealing. And simply taking, using an intermediary in between to effectuate that. Do you have a case, excuse me, do you have a case that you're relying on for that proposition? We're citing to Crosby versus Beam itself for the proposition that the majority controlling shareholder has the duty to not allow the corporation to engage in self-dealing. Undisclosed self-dealing. And there's no question that, again, back to the point about what had been disclosed and what had not in that earlier deposition, the individual transactions were simply never disclosed that had been going on. We learned about that in discovery. And that's why the case hadn't been made. Your time is up. I'm sorry. Do you have any other questions? No. Do you have any other questions? Okay. Thank you very much. Thank all of you for your arguments.